

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | W. Thomas Rosemond Jr. |
|---|---|---|---|
| **CASE NUMBER** | 95 C 744 | **DATE** | 5/22/00 |
| **CASE TITLE** | | Cecil Watson vs. Marvin T. Runyon | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Magistrate Judge's <u>Report</u> recommending that the District Judge enter Judgment for the defendant and against the plaintiff is hereby entered of record.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | MAY 23 2000 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | | 65 |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| SEC/LG | courtroom deputy's initials | | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

MAY 2 3 2000

CECIL W. WATSON,                    )
                                    )
            Plaintiff,              )
                                    )        MAY 2 3 2000
      v.                            )
                                    )   Case No. 95 C 744
                                    )
MARVIN T. RUNYON,                   )   Judge Hibbler
Postmaster General,                 )
United States Postal Service,       )
                                    )
            Defendant.              )

TO:  The Honorable William Hibbler
     United States District Court

### REPORT AND RECOMMENDATION

W. Thomas Rosemond, Jr.
United States Magistrate Judge

This is an employment discrimination action predicated on various charges of unlawful retaliation. The parties have agreed that the contested issues of fact and law are as follows:

1.  Whether the defendant retaliated against the plaintiff when he was not provided with the similar supervisory coverage at the South Oak Park Post Office that was provided to another supervisor, Mr. Carlo Lombardo at the River Forest Post Office, when plaintiff replaced his manager, James Riccio, while he was on vacation during the period of July 6th and July 17th, 1992. Mr.

Lombardo replaced his manager, Mark Rosenwinkel, while he was on vacation during the period of July 6th and July 10th, 1992.

2. Whether James Riccio, the plaintiff's Station Manager, gave the plaintiff a performance rating of "Very Good" rather than "Outstanding" for his 1992 annual Merit Evaluation based upon plaintiff's previous Equal Employment Opportunity Commission activity.

3. Whether the defendant displaced the plaintiff from the South Oak Park Post Office due to the 1992 - 1993 Postal Service Restructuring, or because of retaliation for plaintiff's Equal Employment Opportunity Commission activity.

An evidentiary hearing regarding the above-enumerated issues was held on May 11th, May 12th, and May 13th, 1998.

Having reviewed the pleadings, heard the oral arguments of the pro se plaintiff and counsel of record, observed and studied the demeanor of the witnesses and otherwise considered and weighed their testimony, and having weighed and considered all of the evidence and law presented by the parties, the Court hereby makes the following Findings of Fact and Conclusions of Law:

2

## FINDINGS OF FACT

1.    Plaintiff Cecil W. Watson is an African American male who has been employed by the United States Postal Service with brief interruptions since 1984.  He began his career with the Postal Service as a letter carrier at the South Oak Park Post Office.  Among the decision-makers who hired the plaintiff as a letter carrier at the Oak Park Post Office was the Manager of Customer Services, Mr. George Anthony Stuper.

2.    In the beginning of his postal service career, the plaintiff undisputedly possessed "excellent skills, good people skills, and [was] knowledgeable."[1]  He was a rising star.  He was "promoted quicker than any one" known.[2]  His rapid rise up the postal service hierarchy was phenomenal.  After only four years of postal service, plaintiff had been promoted to supervisor.  By contrast, plaintiff's boss, Postmaster Ronald Pusateri, was with the Postal Service for about 15 years before he was promoted to a

---

[1]    Tr. 310, Tr. 312, Tr. 355, Tr. 371, and Tr. 373.

[2]    Tr. 310, Tr. 312, Tr. 313, and Tr. 340.  The fact that plaintiff prosecuted his own case, without the assistance of counsel, and did so in a most professional and knowledgeable manner, keeping two highly experienced and talented government prosecutors at bay attests to the plaintiff's great intellectual capabilities.  He should be in law school instead of the Postal Service.

titled supervisor position.

3. In November of 1988, the plaintiff became a titled supervisor at the River Forest Post Office at the Executive Administrative Schedule-13 grade level, or EAS-13. The River Forest Post Office is a branch of the Oak Park Post Office.

4. On April 7, 1990, plaintiff was denied a promotion to the position of Branch Manager at the River Forest, Illinois Post Office. Subsequently, plaintiff filed a civil rights complaint based upon racial discrimination with the Equal Employment Opportunity Commission ("EEOC").

5. To some of his postal service contemporaries, the plaintiff's attitude towards the Postal Service in general changed around 1990 when he was not selected as the Branch Manager of the River Forest Post Office. Plaintiff, himself, admits that from that point on he "was suffering stress attributed to the fact that [he had] not [been] promoted to the Branch Manager [position] in 1990."[3]

6. As noted above, when he was not selected as Branch Manager for the River Forest Post Office, the plaintiff filed an Equal Employment Opportunity complaint against Mr. George Stuper,

---

[3]     Tr. 550.

Manager of Customer Services at the Oak Park Post Office, charging Mr. Stuper with race discrimination. A number of the plaintiff's contemporaries were generally aware of his EEOC activity, even though not necessarily familiar with the specifics thereof. It was office hearsay. The gossip stemmed in part from Mr. Stuper, himself, who told a number of individuals about the plaintiff's EEOC complaint against him, because he was shocked at the allegations leveled against him, and felt compelled to talk about the matter with a few of his colleagues.

7. On September 9, 1991, plaintiff applied for and was competitively selected for the position of Superintendent, Station Operations, at the South Oak Park Post Office. It was a grade level, Executive Administrative Schedule-15 ("EAS-15") position.

8. Between July 6th and July 18th, 1992, the supervisory structure of the two branches of the Oak Park Post Office was as follows:

### South Oak Park Post Office:

James Riccio:
   EAS-18, Station Manager

Cecil Watson:
   EAS-15, Superintendent,
            Station/Branch Operations

**River Forest Post Office:**

> Mark Rosenwinkel:
>     EAS-16, Station Manager

> Carlo Lombardo:
>     EAS-13, Superintendent,
>               Station/Branch Operations

Both station managers reported directly to the Postmaster of the Oak Park Office, Mr. Ronald Pusateri.

9.    From the plaintiff's perspective, plaintiff's non-selection as Branch Manager for the River Forest Post Office, and his resultant EEOC complaint against Mr. Stuper, caused sufficient tension in the work environment so as to cause him substantial stress. Apparently, it also made him very suspicious whenever it appeared that he was being treated differently than similarly situated white supervisors. One such circumstance was Mr. Stuper's inability to provide plaintiff with full and complete supervisory assistance coverage for the entire time period of July 4th through July 18th, 1992.

10.    Between July 4th and July 18th, 1992, Branch Manager James Riccio went on leave, and plaintiff was selected to replace him. During that time period, plaintiff received supervisory assistance from Ben Cozzone on July 6th through July 8th and July 13th through July 15th of 1992. Plaintiff received no

supervisory assistance for the interim days between July 9th and July 12th, 1992. During the same time period, Branch Manager Mark Rosenwinkel went on leave, and Carlo Lombardo was selected to replace him. Lombardo received supervisory assistance throughout the entire time Rosenwinkel was on leave.

11. It is undisputed that "it [was] unusual to approve the absence of two managers at the same time."[4] And, it is undisputed that with respect to supervisory assistance, the plaintiff was treated differently than Mr. Carlo Lombardo in July of 1992. Mr. Stuper was responsible for obtaining supervisory assistance for the plaintiff. He misjudged his ability to obtain coverage for the entire time period needed by the plaintiff:

> **Government:** ... you allowed them both [Messrs. Riccio and Rosenwinkel] annual leave.
>
> **Mr. Stuper:** Yes, I did.
>
> **Government:** And why did you do that?
>
> **Mr. Stuper:** Riccio put in first and I approved it and then Mark Rosenwinkel submitted one [leave request] later. And I know Mark always goes on vacation at this period of time. He goes to his cabin that his family owns. And I

---

[4]    Tr. 199.

<blockquote>
felt I could cover it despite
the two managers being off.
</blockquote>

**Government:** So at that point in time you
felt you had enough people to
adequately run the Post Office
without them?

**Mr. Stuper:** Yes.[5]

However, Mr. Stuper was only able to obtain supervisory coverage

for the plaintiff for the time periods of July 6th through July

8th and July 13th through July 15th. He "figured [that] . . .

[the plaintiff] could handle the job by himself for a week or

two,"[6] or more specifically, the time period of July 9th through

July 12th. This was so, because Mr. Stuper considered the

plaintiff to be "a seasoned supervisor."[7] Not only was Carlo

Lombardo considerably less experienced than the plaintiff, but

his acting manager assignment was "his first time as [a] manager

. . . for a week at a time."[8] Although Mr. Stuper did treat

plaintiff differently than he treated Carlo Lombardo, there was a

rational basis for the difference in treatment. There are no

facts suggesting that the difference in treatment was in any way

---

[5]   Tr. 199.

[6]   Tr. 200.

[7]   Tr. 206.

[8]   Tr. 206.

8

retaliation for the plaintiff's EEOC activity.

12. In 1992, upon the retirement of the Oak Park Station Manager, Mr. James Riccio, the plaintiff was selected by Mr. Stuper to replace Mr. Riccio. **It is undisputed that Mr. Stuper could have selected any one for the position**. It is undisputed that there were several experienced individuals more senior to the plaintiff who could have been selected for the position. Nevertheless, Mr. Stuper chose the plaintiff. He did so pursuant to his practice and custom of "usually" selecting "the assistant,"[9] and the plaintiff was at the time Mr. Riccio's assistant.

13. Another example of the plaintiff's distrust and lack of confidence in the ability of his superiors to treat him fairly and justly, all flowing from his non-selection as the River Forest Branch Manager, was the plaintiff's failure to receive an "Outstanding" performance rating. On August 31, 1992, plaintiff received an annual merit rating of "Very Good" from his immediate supervisor, South Oak Park Station Manager, James Riccio. Plaintiff believes that the failure to award him an "Outstanding" performance rating was in retaliation for his EEOC activity.

---

[9]     Tr. 176.

However, it should be noted at the outset, that none of the branch-level supervisors or managers within the Oak Park Post Office received performance ratings higher than "Very Good" in 1992.

14. For as long as he had been Station Manager for the South Oak Park Post Office, Mr. James Riccio, himself, had never received an "Outstanding" performance rating.

15. Postmaster Ronald Pusateri, himself, in all of his years as Postmaster at Oak Park had never received an "Outstanding" performance rating.

16. At no time in his career with the Postal Service, had the plaintiff, himself, ever received an "Outstanding" performance rating. His ratings had always been "Very Good", no higher, no lower.[10]

17. Under outstanding Postal Service policy, "Outstanding" performance ratings were **rarely given**, and were reserved for employees whose work performance was truly exceptional. Additionally, the Postal Service had a ten percent cap on the number of "Outstanding" performance ratings that a Post Office could award. There are no facts suggesting that the plaintiff's

---

[10]    Tr. 531.

failure to obtain an "<u>Outstanding</u>" performance rating was in any way retaliation for his EEOC activity.

18. On June 8, 1993, the EEOC issued a recommended decision with a finding of discrimination based upon plaintiff's race in his non-selection to the position of Manager, Station or Branch Operations, grade level Executive Administrative Schedule 16 (EAS-16).

19. On July 9, 1993, the Postal Service issued a Final Agency Decision accepting the EEOC's recommended decision, including the ordered "make whole" relief.

20. In 1992 through 1993, the United States Postal Service underwent a nationwide reorganization that had an impact on the numbers and grade levels of supervisory and managerial employees. At the time of the restructuring, many positions were abolished or eliminated.

21. Prior to the 1992 through 1993 Postal Service restructuring all supervisor positions were a level 15 position. During the restructuring, these positions were upgraded to level 16's, with a change of title. Branch managers were not affected by the restructuring.

22. When the restructuring first commenced, all affected supervisors were told that their positions were abolished. All

supervisors affected by the reorganization were required to submit an application form, to-wit: PS Form 991, to their respective District Office. The supervisors were permitted to submit along with the Form 991's a selection sheet wherein they identified three branch or station choices to which they would like to be reassigned, if rehired by the Postal Service. A PS Form 991 has been described by some Postal Service supervisory staff as being somewhat like "a job interview. [The applicant] fill[s] out all of what [he or she has] done through[out] [his or her] career."[11]

23. Due to the nationwide Postal Service reorganization, on February 6, 1993, plaintiff's position and grade level were changed from Superintendent, Station/Branch Operations (A), Executive Administrative Schedule 15 (EAS-15), to Supervisor, Customer Services, Executive Administrative Schedule 16 (EAS-16).

24. On or about February 2d, 1993, Postmaster Ronald Pusateri was advised by his superiors in Carol Stream, Illinois that, under the reorganization plan, the supervisor staffing requirements authorized for the Oak Park and River Forest Post Offices would be a total of nine permanent customer service

---

[11]    Tr. 419.

supervisors, an increase of one titled supervisor position. Upon being so advised, Mr. Pusateri made job offers "to each and every supervisor that [was] currently staffed there,"[12] which at the time numbered eight. **Included in the group job offer was the plaintiff**. The ninth authorized permanent position was offered to Ms. Fran Connolly who had yet to start at the Oak Park Post Office, having just signed her job offer. Ms. Connolly had been excessed out of the Palatine Post Office where she had been a delivery supervisor.

25. On or around February 17th, 1993, Oak Park Postmaster, Ronald Pusateri, learned that an error had been made by the District Office, and that he was required to downsize his office from nine supervisors to six. There was nothing that Postmaster Ronald Pusateri could have done to retain the three positions lost.

26. At the time of the mandated reduction in force at the Oak Park Office, the three most junior supervisors were Messrs. Ben Cozzone, Carlo Lombardo, and Cecil W. Watson, with Carlo Lombardo being the most junior of all.

27. On February 19th, 1993, Postmaster Pusateri held a

---

[12] Tr. 236.

brief meeting with all eight of his supervisors, and advised them that two of them would have to be excessed. He indicated that he would make the decision over the upcoming weekend.

28. On or around February 22d, 2000, Postmaster Pusateri held a meeting with all of his supervisors, except for his three most junior supervisors, to-wit: Messrs. Cozzone, Lombardo, and Watson, and Ms. Fran Connolly, who had yet to start working at the Oak Park Office.

29. The purpose of the February 22, 1992 meeting was to "brainstorm" how the Oak Park Post Office was "going to cope with the reduction in staff and who was going to stay."[13]

30. Postmaster Pusateri was concerned about "running [his] [Post] Office with 40 percent less supervisors."[14] He sought to evaluate the qualities and skills of his supervisors to determine who he would keep and who he would let go. He "was solid on five, but ... wasn't solid on [the] sixth position."[15]

31. Over the weekend, Postmaster Pusateri had decided which five of the eight supervisors he would keep, based on the needs

---

[13]     Transcript of the May 11, 1998 proceedings before the Court, at 164.

[14]     Tr. 242.

[15]     Tr. 242.

of the Oak Park Post Office, the specialized skills that each had to offer, and their ability to work together as a team. He wanted input regarding the sixth position.

32. In convening the February 22d meeting, Postmaster Pusateri had "decided to use team management skills"[16], "and ... asked the staff [the supervisors present] ... to give [him] input on [the] sixth position."[17] The February 22d team management meeting was not the first such meeting held by Postmaster Pusateri. He had held such meetings "on many occasions."[18]

33. Postmaster Pusateri "wanted [the] input [of the Oak Park personnel in attendance] on who was going to stay and who was going to go."[19] The strengths and weaknesses of two people were discussed, to-wit: the plaintiff and Ben Cozzone. Input was only needed for Messrs. Cozzone and Watson, because Postmaster Pusateri had already made the "decision that Mr. Lombardo was not going to be part of the Oak Park Post Office"[20], due to "the fact

---

[16]    Tr. 242.

[17]    Tr. 242.

[18]    Tr. 325.

[19]    Id.

[20]    Tr. 243.

[that] he had only been with [the Office] for about a year."[21] In other words, he was the **most** junior supervisor. With respect to Ms. Connolly, since she had never been at Oak Park, she was simply told that she could not come because there was no position for her to fill.

34. At the February 22d, 1993 meeting, Postmaster Pusateri explained to those individuals present what qualities he was looking for with respect to those persons chosen to remain at the Oak Park Office, to-wit: "he wanted [the staff] to be able to work together, to do the same quantity of work with less amount of supervisors."[22] These were "[t]he instructions that [he] was given [by] the district manager, [to-wit:] to select people who had good people skills and were team players."[23]

35. At the February 22d meeting, the subject of the plaintiff's EEOC complaint was raised. The comment "[c]ame from supervisor Jim Carmichael."[24] Carmichael was not the plaintiff's supervisor. His rank was equal to that of the plaintiff. Postmaster Pusateri "told Jim Carmichael in no uncertain terms

---

[21]    Tr. 244.

[22]    Tr. 210 (and Tr. 255).

[23]    Tr. 248.

[24]    Tr. 250.

16

[that] there would be no talk like that in [the] meeting. It had

no bearing on the best person for the Oak Park Post Office."[25]

36. Other than explaining the purpose of the meeting, and

his reprimand of Jim Carmichael, Postmaster Pusateri made no

comments. He just "listened."[26]

37. Plaintiff was viewed by some of his supervisors as not

being "a team player . . . uncooperative . . . and . . .

inflexible."[27] Plaintiff was viewed as a man who went "by the

book and that was it."[28] He was inflexible in this regard.

38. Postmaster Pusateri needed an individual with a strong

mail processing background. Plaintiff's area of expertise and

experience was delivery services. Mr. Ben Cozzone's area of

expertise and experience was mail processing.

39. Postmaster Pusateri weighed and considered the

comments of the supervisors present at the February 22d meeting,

along with his own thoughts and conclusions regarding his needs

and desires that he had reached over the weekend, and analyzed

the same as follows:

---

[25]    Tr. 250.

[26]    Tr. 254.

[27]    Tr. 223 (and Tr. 437).

[28]    Tr. 436.

**Government:** By the end of February 22nd, you had to have your supervisors down to six?

**Mr. Pusateri:** Yes.

**Government:** And there was nothing you could have done to have seven or eight the next day?

**Mr. Pusateri:** None whatsoever. There is no bargaining. There is no feedback. This is the number. That's the number you got to come down to.

**Government:** And during this meeting you met with all your supervisors who were on duty who were not going to be affected by this particular decision?

**Mr. Pusateri:** Yes.

**Government:** You already decided Fran Connolly was the easiest choice because she had never been there?

**Mr. Pusateri:** Right.

**Government:** And then Carlo Lombardo was so junior to everyone else, you decided for him to go as well?

**Mr. Pusateri:** That's right.

**Government:** In fact, he kind of knew it and didn't contest it at all?

**Mr. Pusateri:** **He expected it**, when I talked to him. He was a fine supervisor and an excellent

gentleman, but he knew it.

**Government:** So your decision came down to which one to keep, do we keep Ben Cozzone or do we keep Cecil Watson?

**Mr. Pusateri:** Yes.

**Government:** Now, even though you lost three positions, you still had to do the same amount of work? The same mail had to come in and had to go out. Did you look at your senior staff and identify what their strengths were?

**Mr. Pusateri:** Yes. I had to see what I had to work with, obviously. At that point in time we had all of our accounting duties. And **Lionel Ross**, who was our accounting supervisor for years, was terrific at it, I said that's **number one**.

**Secondly**, **Jim LoBello** was our superintendent with window services handling a million dollar stamp stock. I can't do that job, and there is no one else in the supervisory staff that can do the job of Jim LoBello, so I selected Jim.

Carrier One Unit was **Patsy Bennish**, had been doing it for ten years, very good at it.

**Jim Carmichael**, Carrier Unit

19

Two, Senior at the Oak Park Post Office, been there almost as long as I have. So loyalty to him, and he does a good job, so he was there.

Now, mail processing, I had took a tremendous hit in the system-wide restructuring. I lost the Manager of Mail Processing, the Supervisor 16 was eliminated. Two supervisors for mails were gone, and I only had **Dave Rossow**, he was my daytime supervisor.

Government: He worked on what lay people call the midnight shift?

Mr. Pusateri: The midnight shift, right. Daytime to him, yes.

Government: Prior to restructuring, how many supervisors did Oak Park have?

Mr. Pusateri: Supervisors, we had three.

Government: And the manager?

Mr. Pusateri: And a manager and a tour supervisor that was left unfilled.

Government: So before restructuring you had five spots to do the supervision and management of mail processing?

Mr. Pusateri: Right.

Government: And now at the end - as of this date you were down to one?

**Mr. Pusateri:** Right.

**Government:** With one open spot?

**Mr. Pusateri:** Right.

**Government:** What went through your mind about filling that sixth spot?

**Mr. Pusateri:** **I had to look to see who had experience in mail processing.** And between Cecil Watson and Ben Cozzone, Ben had experience in mail processing. Started his career as a clerk, knew the separation.

And I also knew that looking at the staff - and, again, I didn't know what I was getting into. This was totally uncharted territory for me as Postmaster, losing 40 percent of the staff, losing the managers, that we had to hit the floor running the next day to get that mail out the door. The customers were not going to accept any nondelivery. And none of my responsibilities were taken away. **So that was a factor in keeping Ben Cozzone over Cecil Watson.**[29]

Had Postmaster Pusateri been permitted to keep **seven** permanent customer service supervisors instead of six, he would have kept the plaintiff.

---

[29] Tr. 322 - Tr. 324 (emphasis added).

## CONCLUSIONS OF LAW

1. Any of the foregoing Findings of Fact which may be deemed a Conclusion of Law is hereby adopted as a Conclusion of Law. Any of the following Conclusions of Law which may be deemed a Finding of Fact is hereby adopted as a Finding of Fact.

2. The Magistrate Judge has jurisdiction of the parties and the cause.

3. The Postal Service did not retaliate against the plaintiff for having filed complaints with the Equal Employment Opportunity Commission.

4. The United States Postal Service did not retaliate against the plaintiff when he was not provided with the similar supervisory coverage at the South Oak Park Post Office that was provided to another supervisor, Mr. Carlo Lombardo, at the River Forest Post Office, when plaintiff replaced his manager, Mr. James Riccio, while he was on vacation during the period of July 6th through July 17th, 1992. The Postal Service misjudged the situation believing incorrectly that supervisory assistance would be available. It was not available for the entire time period at issue. Mr. Lombardo was considerably less experienced than the plaintiff, who was a seasoned supervisor fully capable of working alone for a week or two. The Postal Service readily admits - as

22

it must - that an error in judgment occurred which adversely affected the plaintiff. Errors happen. It appears to have been an isolated incident. It does not appear to have been part and parcel of a pattern and practice of retaliatory conduct. Nor was the adversity sustained by the plaintiff significant. Plaintiff was a seasoned supervisor fully capable of operating the Post Office at issue for a week or so alone. By comparison, Mr. Carlo Lombardo was considerably less experienced as a supervisor than the plaintiff, and not capable of running a Post Office alone for a week or so. The reasons for the difference in treatment of Messrs. Watson and Lombardo appear reasonable and non-pretextual.

5.     When Mr. James Riccio, the plaintiff's Station Manager, gave the plaintiff a performance rating of "Very Good" rather than "Outstanding" for his 1992 annual Merit Evaluation, it was based on his analysis of the plaintiff's work performance, and was not in retaliation for the plaintiff's Equal Employment Opportunity Commission activity and complaints.

6.     Mr. James Riccio was the plaintiff's supervisor for about a year and a half. He only evaluated the plaintiff's work performance for the year 1992. He only evaluated the plaintiff once. The evaluation that he gave the plaintiff was "Very Good". The rating was not unusual or out of line or in any way

inconsistent with Mr. Riccio's performance rating history. From 1990 through 1992, Mr. Riccio had never given any of his supervisors an "Outstanding" performance rating.

7.    It appears that Mr. Riccio's relationship with the plaintiff, although amicable, was not overly friendly. Notwithstanding the no more than cordial relationship, it appears that Mr. Riccio's evaluation of the plaintiff's work performance was **honest**. He felt that he could not give the plaintiff an "Outstanding" rating given the plaintiff's poor public relations, or ineffective "PR" skills. Far too many customers complained about the plaintiff:

> **Mr. Riccio**: Well, it would be really tough to give him an "Outstanding" because of that one thing [that is, the customer complaints]. Plus, the Office didn't make all the goals. And, I don't know if this matters, but I didn't get an "Outstanding", and I was the manager. I got a "Very Good". It'd probably be closer to a "Good" than an "Outstanding". In my heart, I could never give him an "Outstanding". I wouldn't feel right about that.

> **Government**: And when you say **"the one thing"**, are you referring to the customer complaints?

| **Mr. Riccio:** | Yes. |
| **Government:** | Did you ever get an "<u>Outstanding</u>", Mr. Riccio? |
| **Mr. Riccio:** | No.[30] |

Some of the customer complaints were undoubtedly racially motivated. There were some residents of the area who were not accustomed to seeing a black man in a position of authority at their Post Office. But some of the complaints were due to the plaintiff's "gruffness".[31] It was a "weak point" that Mr. Riccio had discussed with the plaintiff on more than one occasion.[32]

7. Mr. James Riccio believed that the plaintiff needed to "handl[e] [the] customers better."[33] This perception of his was not inconsistent with that of other supervisors and colleagues of the plaintiff who also observed his weak customer relations skills. In any event, Mr. Riccio's rating of the plaintiff's work performance was based solely on his perceptions of the plaintiff's skills and capabilities, and had nothing to do with the plaintiff's Equal Employment Opportunity Commission activity

---

[30]    Tr. 393 (emphasis added).

[31]    Tr. 390.

[32]    Tr. 390.

[33]    Tr. 391.

or complaint.

8.     The plaintiff was displaced from the South Oak Park Post Office as a result of the reorganization of the Postal Service.  It was not due to his Equal Employment Opportunity Commission activity.  He was among the junior supervisors, and they were logically among the first to be displaced.  Mr. Carlo Lombardo was the **most** junior supervisor of all, and when he was displaced, it came as no surprise to him.  Indeed, he expected it.  Moreover, perhaps, due to his stress stemming from his rejection for the River Forest Branch Manager position, or for whatever reasons, but the plaintiff's attitude changed, and he became inflexible and uncooperative in his dealings with some of his contemporaries.  He was not viewed as a "team player" by his contemporaries.  This "attitude" problem, his junior status, and his insufficient experience in the area of mail processing made him a logical choice to be excessed to another Post Office. These reasons appear reasonable and legitimate, and are not pretextual.

9.     The Postal Service has articulated legitimate non-retaliatory reasons for its actions via-a-vis the plaintiff. There is no evidence that the reasons proffered are pretextual.

Accordingly, it is adjudged, decreed, and ordered as follows:

Judgment in favor of defendants and against the plaintiff is hereby entered.

**Recommendation:** The District Judge should enter Judgment in favor of defendant and against the plaintiff.[34]

So Recommended.

Dated: May 22, 2000

W. Thomas Rosemond, Jr.
United States Magistrate Judge

---

[34] Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties must file their objections to the Report and Recommendation with The Honorable William Hibbler within 10 days after being served with a copy of the report. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's report. Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538 (7th Cir. 1986). See also, Provident Bank v. Manor Steel Corporation, 882 F.2d 258, 261 (7th Cir. 1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or §636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's report).